Welcome to the Fourth Circuit. We're glad to have everyone this morning. We have three cases, beginning with case number 25-1350. We'll be glad to hear from you, Mr. Hawkins. Thank you, Judge Quavabaugh. May it please the Court, members of the panel. I'm Richard Hawkins. I'm with the Hawkins Law Firm. I'm here this morning, and it's my privilege to be here this morning on behalf of the appellant, Mr. Kelly. Your Honors, back when he was a lowly justice of the New York Court of Appeals, pre-Supreme Court Justice Benjamin Cardozo famously said that a beneficiary about to plunge into a ruinous course of dealing may be betrayed by silence as well as by the spoken word. And silence here betrayed Mr. Kelly. Silence betrayed Mr. Kelly with fidelity when they failed to tell him in his November 2, 2020 conversations about the connectivity between the key transactions at issue. Silence betrayed Mr. Kelly from Altria when they failed, or it failed, as part of its benefits reviewed to even address the issue of connectivity. And then silence failed Mr. Kelly one more time when Altria kept him in the dark when he specifically asked for the Administrative Services Agreement that is covered under the ERISA statute, and they failed to provide it to him. Now, all three claims were presented to the District Court, and the District Court granted summary judgment against Mr. Kelly for all three claims. And we believe those rulings are erroneous. They ask that they be reversed and remanded, sent back. And with respect to the A1B claim, if necessary, to be sent back to Altria for further review. Now before I get into the three claims, and I know the facts are set forth in all of the briefs, but I do want to set the table. Back in 2020, Mr. Kelly had a 401k in the DPS plan that was sponsored by Altria. Those were planned funds. They were kept by Altria and managed through various interactions with Fidelity. And he wanted to get them out, and he wanted 80 separate transactions. There were a lot of moving parts, and those parts in some levels were explained to Mr. Kelly by Fidelity. There were two key transactions in order to get all of his money out. We call it the in-kind transaction, and that's the selling of three different shares of stock, Kraft, Heinz, Philip Morris International, and Mondelez. And they did that in a way that maximized tax savings. So it took a while to get that transaction completed. And then there was the cash transaction. That's transaction number two, and that was the transaction that involved the sale of his index fund and shares of Altria stock. So would they, were the funds, this isn't really that pertinent to the claim, but I just want to make sure I understand it. They were in retirement funds before these two things took place, right? Correct. And were they being moved from retirement funds to non-retirement funds? He was liquidating his 401k. So that would have had tax implications, but those aren't the implications that necessarily are the ones from the net NUA tax planning, correct? They are, but that's not part of this case. I mean, I guess that's not the right way to He had over $5 million in funds. The NUA was part of it. The cash was $3.9 million. And the two transactions required different settlement periods to be completed. And Fidelity explained those two periods. They said the cash transaction is shorter, three to five days, if that. And the in-kind transactions, because they have to do all this additional paperwork and evaluate the asset basis, the stock basis, it takes longer. And they said seven to 10 business days. But what they didn't tell him, and there's no place in the record where they did, on November 2nd, November 5th, November 10th, once they finally revealed it, but no time when he could have made a difference, did Fidelity tell Mr. Kelly that the transactions were linked. As the Fidelity representative told him on November 10th, after he couldn't do anything about it, told him they were connected at the hip. You have, as I understand it, there's a denial of benefits claim and there's a breach of fiduciary duty claim. I know there's other claims about the documents and attorney's fees. Correct. But let's just talk about those two, what I call primary liability claims, for lack of a better word. And this is really how we review the first claim, the denial of benefits claim. You opened with this quote, and I appreciate that quote, but in the context of a RISA plan like this, we're really looking, I think, at the administrator's review of the claim. You are. And we're not, I think they are, whereas we would normally maybe say, is there a question of fact here, a question of fact there, we don't really look at that claim. We look at whether it's reasonable. And so, first, from our standard of view, do you agree that's how we look at the first claim? I do. I do. So if there was, in theory, a question of fact, if this was a fraud claim, we wouldn't look at it that way. It's just whether it's reasonable. For count one. For count one. And I think it's been said that standards review are like offensive linemen. Yeah, someone said that. Someone said that. But every now and then, that offensive lineman gets beat and the quarterback gets sacked. And here, Mr. Kelly got sacked because the committee didn't do its reasonable review. And you're right, you're not asking whether it's right or wrong. What you're asking is was the denial reasonable? And the question becomes, how did the Booth factors come into play? And the court, of course, has addressed eight factors. What's your best argument that they did not do a reasonable review? My best argument is factor five, which is reasoned and decision-making process. And I focus on two words. Connectivity and PowerPoint. And I've already... And what was the second one? PowerPoint. PowerPoint slides. And I addressed the connectivity kind of early on here. But the PowerPoint presentation was a presentation that's at JA 719 through 737. I'm sure you've all seen it. It was the product of essentially Altria's experts' review. Tom Hodelang, who was a director of benefits, and their outside ERISA council put together this package that was intended to synthesize all of the information from the claim file. The transcripts, the denial letters, the claim letter. They did their own research about values. And what that PowerPoint shows, and this is why it's an unreasonable denial, that PowerPoint shows that Altria, through its members who presented to the benefits committee, knew that Mr. Kelly's claim was not only that it was a delayed payment, but that it was a lack of information on that first day and that he would kept his money out of the market. They knew that Fidelity didn't tell him until at least November the 10th, according to their own documents. They knew he suffered losses, and they knew that they had a path by virtue of how they were reviewing and their scope of review to either grant the whole thing, deny the whole thing, or grant it, as they should have, and award at least something. Because their own internal documents showed that he had a ceiling, Mr. Kelly had a ceiling of $207,000 and a floor of 32. And just for ease of reference, it's PowerPoint slides 3, 13, 17, 18, and 19. And I submit to the court that those are dispositive. I mean, we can go through the entire transcripts. You can go through the conflict of interest, which I do think is important, although I submit that's the icing on the cake. Mr. Whittaker was somebody who had a previous relationship or previous interactions with Mr. Kelly. They weren't positive. We can spin them all day long, but I think the proof is in the pudding in Mr. Whittaker's own reticence at the very end to say, I don't want to sign the letter because of my previous interactions. And I don't think there's any way to portray that as a positive. Well, let me ask you this, but you would agree before the appeal before the board, he did not raise that conflict at that time? We didn't. We didn't. And I think the answer is, we thought we would get a fair review. And it was after the fact, when we got the discovery, when we got that email. I mean, there was some concern about Mr. Whittaker ahead of time, but when we received that email, and a reference for the court, I believe it's J.A. 975, I believe it's J.A. 975, I believe it's J.A. 976. Once we got that, it kind of confirmed something that we were concerned about, and that is they didn't do a proper review. And again, the proof is in the denial letter. But you may or may not have, I'm sorry, you may have not had a good reason not to bring it, but what's the effect? I mean, if you didn't raise it then, do you get to raise it now? Sure. Sure. Because the eight Booth factors apply regardless of what you argued at the claim level. I mean, if you argue, I mean, certainly . . . But how could it be unreasonable? So, is that right? I mean, when your claim is whether someone reasonably reviewed the record, and just on the conflict of interest, if you don't challenge that, you're saying it was unreasonable for them to have someone involved that you didn't complain about? No, I'm not saying that. What I'm saying is that conflict of interest in normal ERISA cases, you see this in welfare benefit cases all the time, you don't challenge the conflict ex ante because you don't necessarily know that it will be a conflict. But you do know that there's an institutional conflict, and we raise that here. We raise that in our complaint. And Helton versus AT&T from this court in 2013, it's a case we cited, recognized that an internal benefits committee made up of high-level corporate employees looking over a benefits claim to be paid out by the fund, it raises a concern. You don't have to raise that. That's an obvious conflict that exists on its face. It's the fox guarding the hen house. But Mr. Whitaker, typically when you deal with a conflict of interest, you deal with it as a matter of discovery. And this court and the Supreme Court in Glenn has held that that can be kind of its own separate inquiry. And so you don't always have to raise it ahead of time. And I think what we thought is that we were going to get a fair review, and I think when we realized that the MCEB had only reviewed half of Mr. Kelly's claim, they had never addressed the connectivity, even though the PowerPoint slides put it right in front of their face, that we didn't get a fair review. And then when we get the email from Mr. Whitaker, it raises even more red flags. So, Your Honor, we don't need a smoking gun, and Your Honors can conclude that it was not even relevant to Your Honor's decision. It doesn't change anything. As I said, it's the icing on the cake, but it's not the reason detra that we win. Well, I think on that claim, on the conflict of interest of the district, there's nothing in the record of actual bias. You don't need it. I mean, the actual bias is very rarely something that somebody's going to see. They're never going to say, oh, I hate this person, and therefore there is the bias. But the bias is obvious from looking backwards at what happened. You see the statement by Mr. Whitaker, and you look at the fact that the committee met for hours. They apparently listened to these calls. They had this PowerPoint presentation where the linkage is right there front and center, and they ignore it. Now, I can't say who did what in terms of emphasizing what should be ignored and what should not, but we raise that flag after when we see it, and we can recognize that it wasn't a full and fair review. Can I ask you, can we move to the breach of fiduciary duty issue?  So to prevail on the breach of fiduciary duty, obviously you need to have a fiduciary, and my understanding is your claim is that Fidelity was functioning as a fiduciary, but I don't see that in the agreement, and I'm hoping that you can help us by identifying what discretionary authority Fidelity possessed, in your view, that would make it a fiduciary. They had the discretion to help set up the transaction. What they did is they advised Mr. Kelly about what strategy to take to get his money out. Did they advise, or did they just tell him what his options were? I think it's both, and the way I say that is because if you listen to the conversations and you hear the flow, there's a disclaimer here, there's a disclaimer there, I understand that, but if you listen to what's being asked, Mr. Kelly wasn't seeking investment advice. He didn't ask what item to put it into necessarily. He didn't say I want to, you know, which stock is better, but he asked how do I set up the transaction to get my money out faster. Is that discretionary? I mean, I did read the transcripts, and I read them as giving your client options, and that doesn't strike me as discretionary. I appreciate that, Your Honor. I respectfully disagree. I believe that what he was asking, he had his experts on the line, but Fidelity were the experts of the machinery of the plan, and so they were giving him options, but they were steering those options, and I believe that's how, at least as a matter of interpreting the facts in favor to Mr. Kelly, which is what you do at summary judgment on a breached fiduciary duty claim, that at the very least there's an issue of fact as to whether or not they were acting as a fiduciary. And I know, you know, we focus on the first two calls to see what they said and what they did, but I think it's reasonable to understand that Mr. Kelly believed that he was getting advice, and if you look on pages JA 508, 509, and 510 of the transcript, you'll see he said, I wouldn't have taken this path without you. But, you know, there's advice and there's facts. I understand. I mean, he called and asked for information. Correct. And called the customer service number, whatever, and got information for sure, but, you know, and it just seems that definition of fiduciary would be extremely broad. I mean, if you call, you know, it's clear he has decided to move the funds. He wants information about how to do it as quick as possible, and certainly he asks that and gets information, but it just seems if you're, anyone is, you know, with their mind made up about how to, what they're going to do, and you call someone and ask them, you know, for information, that would make breach of fiduciary claims extraordinarily strong or broad. I agree, and we are not asking this court to issue a rule of law that says that, you know, every time somebody calls a call center or a customer service center that's supporting a plan, that all of a sudden they become fiduciaries. We're asking this court to look at the specific facts of this case. Yeah, but, I mean, that's fine. You're not asking us to do it, but if we rule in your favor, then everyone else will say, look, this is a call center, and if they're a fiduciary, then who isn't? Well, I think, Your Honors, that the authors of any opinion have the power to confine it, but I think what we would say here is that fidelity went farther than simply acting as a record keeper. I was going to ask you this. How is this any different than our HealthSouth case or Adam's case where it discusses ministerial administration? I mean, because that's what it seems like. It seems like it, but if you listen to the dialogue, he is asking and he is responding, he is choosing from what they are giving him based on the emphasis that they are giving, and I think if you listen to the Raleigh call, the second call on November 2nd, the tone of that discussion, there's a push to fidelity assets, there's a push to fidelity products and accounts, and I think that's the key, and I appreciate your court's comments. I have 30 seconds, so I'd just very briefly like to address the administrative services agreement. I think the textual piece here, the issue is whether or not the plan is, or the ASA, is something under which the plan is managed. I think that's the key one. If we agree with you, what's the proper course? If we agree with you on the administrative services agreement that it was indeed covered by the statute, what's the proper next step? The proper next step is to send it back down to the district court for a question of penalties, because I believe that's a discretionary question for the court. Isn't there a need also to determine materiality? Explain your honor, please. It's my understanding that the penalties are not necessarily warranted unless the document would have been material to your claim. I think that's right. I think that's right. I think here there can't be any . . . So it's not just a determination of penalties, there needs to be a second look at the document itself to see whether it would have made a material difference to your claim. I'm not sure it goes quite that far, because I don't believe that a claimant has to be prejudiced. I don't . . . the showing of prejudice is not required for purpose of a penalty. But I think here there would be no doubt that it was material, because Fidelity relied on it and so did Altria at the various earliest stages to say they weren't a fiduciary. So I don't think there's any question it's material. If we had it ahead of time, we may not have even sued for a breach of fiduciary duty. But the fact of the matter is, we think that the next step would be to send it back down. Well, let me . . . I know you over time, if it's okay. I don't understand how you get past the language in 1024b-4 that says that it has to . . . that this fiduciary authority has to be delegated, and then if you look at the ACA, I mean, it expressly says the opposite, is not any discretionary authority, that this is just . . . that there's no fiduciary duty here between them. And I want to understand your question, Your Honor. Are we focused about the disclosure claim or the fiduciary duty claim? No, the disclosure claim. Okay. Well, I think it's important to look at the actual text. There's nothing in the text that says that a delegation of fiduciary or discretionary authority has to be part and parcel to whether or not a document be disclosed. There's no limit on that in the statute itself. I think the statute's very clear. It says you have to show . . . you have to provide it if it is a document under which the plan is managed, and fidelity . . . the plan doesn't function without fidelity. Whether they're a fiduciary or not, they are more than a record keeper. They're providing administrative services, and that's in the Schedule B in the document. Whether they're a fiduciary or not is irrelevant. The statute doesn't require that. Okay, but back . . . and then I guess in follow-up to Judge Berner . . . Yes. How do you . . . I mean, if I'm looking at the plan, and it clearly says that they are not a fiduciary on your first issue. Okay, the plan says that they're a record keeper. The ASA specifically says who is and is not a fiduciary according to their own terms. But to Judge Berner's question and to yours, the question then becomes, all right, let's say it's covered. All right, so it should have been produced. And then the question is, should penalties be awarded? And I believe that's a multi-factor inquiry related to the materiality and then whether or not they should have known or whether or not they acted in bad faith or had intentional misconduct. So, I appreciate the Court's questions. Thank you very much. Thank you, Counsel. You have a few minutes on rebuttal when you come back. Counsel? Good morning. It pleases the Court. My name is Mike Schabelsky. I'm counsel for the two Altria defendants. I would like to spend the majority of my time, I think, addressing the Altria Fidelity contract claim. But first, I'd like to make just a couple of observations about the denial of benefits claim that was discussed this morning. Just so I understand and know who to direct questions to, if our questions relate to the breach of fiduciary duty claim, is that more related to your colleague? Mr. Field, who is Fidelity's counsel, will address those matters, Your Honor. But if you have a question about the contract and how that might bear to it, I'm glad to answer those as well, obviously. And the document disclosure questions? I will cover that, Your Honor. Thank you. All right. On the denial of benefits claim, just a few quick points. First, Your Honor, you're absolutely right. The standard of review for this panel is not to decide this anew, but to decide whether or not Altria abused its discretion in denying the claim. Would it be abuse of discretion? The argument is that when you don't even address connectivity, you, by definition, abuse your discretion. What's your argument in response to that? Yes. The review panel relied on two principal reasons for denying the claim. The first was, whatever confusion may or may not have existed from the November 2nd call, it was clarified by the November 5th call, before the rollover was actually initiated. And in that call, the Fidelity representatives clearly said the components of the rollover could take several business days. And in fact, what happened is that both components were completed even sooner than had been estimated in that November 5 call. Three business days. So both of them, components, were completed by the, I think it was November 12th. So in fact, the rollover to both components had been completed in tandem, and so the linkage issue became moot. But didn't the calls, they may not have expressly said they're connected, but as I read them, they said the first one must be completed and then the next one. That seems to, without using the words, suggest there's that relationship. Absolutely. In the November 2nd call, the first Fidelity representative, I believe twice, said that the way the rollover would take place, both components would be rolled over to the Fidelity retail accounts, and then once both of those were there, then the transfer to Goldman Sachs would take place. So he didn't use the word linkage, but he twice said both components have to be there. And what the panel, the appeals panel was looking at was, not only did they say that. You're not talking about us, right? I'm not talking about you. I'm talking about the Atria panel. That in fact, the two components did in fact roll over in tandem and were available together on November 12th, and only three business days, shorter than had been estimated. So that was the first principle ground, and is that a reasonable basis for denying the  Absolutely. Is that an abuse of discretion? Clearly not. But the second ground they had, which wasn't addressed this morning, they also determined that Mr. Kelly had suffered no damages based on his damage theory that he presented to them. Because they said, under the best case scenario of Mr. Kelly, you would not have had access to the funds to send to Goldman Sachs before November 9th. So we're really talking about the alleged delay was between November 9th and November 12th. Well, you based your damages on the performance of the S&P 500, the spy fund that tracks the S&P 500. You said you would have invested your money in that fund on November 9th. Well, that fund went down between November 9th and November 12th. So you had no damages to boot. So not only were you properly advised, there was no delay in the rollovers, you also suffered no damages. Does that issue . . . I mean, I understand your argument that that relates to a reasonable review. Didn't the district court exclude the plaintiff's damages expert? Yes, in the district court, the plaintiff proffered a new damage theory and proffered a damage expert who had not been proffered before Altria and was arguing a different theory of damages than had been presented to Altria. And that was excluded under 702? Yes, sir. The district court excluded that expert in the new damage theory and that was not challenged on this appeal. And then finally, Your Honors, on the conflict of interest, I want to make sure you understand the record here. There was no conflict raised before Altria and the appeal panel. Now you just heard, they knew the grounds for it, but they knew Mr. Whitaker was going to be on this appeal panel. They didn't challenge it before the appeal panel. When they sued, their complaint didn't allege it. This was some after-the-fact conflict they conjured up in discovery. And Your Honor, as the district court found, there was no there there. There was no evidence of any bias. So it cannot be that Altria abused its discretion because of a purported conflict of interest that was never raised with Altria and, in fact, that has no factual basis. So Your Honors, for those reasons, we ask that you affirm based on the very well-reasoned opinion of the district court on that claim. On the claim of the document disclosure, I'm looking at the statutory language, which our opinion in Faircloth commands that we look at, and it seems pretty clear to me that the contract under which the plan is operated, particularly looking at the ASA itself, seems to fall squarely within that statutory definition. And I think at least two of our sister circuits have agreed that an ASA does fall within the document disclosure provision. So how can we distinguish those two circuit opinions? Yes. You distinguish those opinions, Your Honor, because the contracts in both of those cases gave the third-party administrator discretionary responsibilities. And I think in both cases, the . . . But how is the person requesting the document to know what the ASA says before they get it? You're right. If the document doesn't give any discretionary responsibilities, but it still is under which the plan is operated. Yes. I mean, the plan is operated under that ASA. And whether or not it gives discretionary responsibilities, that might go to the first issue, as Judge Benjamin pointed out, but that can't be known without looking at the document itself. And unless the individual requesting the document, which ERISA provides they're entitled to, has access to the document, then there's no way that they can know whether there's discretion or not. Well, there are two points there, but I might unpack them. First, on the statutory language about a contract under which the plan is operated. In Faircloth, this court held that what that means is, is it a contract under which the plan is managed, or under which the affairs of the plan are directed? Managed or direct the affairs. The contract doesn't give fidelity any authority to manage or direct the affairs of the DPS plan. To the contrary, the contract expressly prohibits fidelity from managing the plan. That is in section two. No, but it definitely gives fidelity the obligation to conduct the affairs of the plan. The individuals have to call fidelity when they have a question. That's the number they call. But that is not directing the affairs of the plan. That is a hotline answering consumer questions. It might not be directing, but it certainly seems to be conducting. No, Your Honor. The section two of the contract, which appears on joint appendix page 1177 through 1178, I believe it's volume five of the appendix, expressly provides that the services that are given to fidelity are a directed nature, and that fidelity will not perform any service to be treated as an administrator or fiduciary of the plan. It goes on to say that nothing in this agreement is intended to give fidelity any discretionary authority or any discretionary responsibility for the plan, and that fidelity's role is that of a directed record keeper. Your Honor, it cannot fairly be said that fidelity manages or directs the affairs of the plan when it is expressly barred from doing any of that. Fidelity has no authority or control over the key aspects of the plan, such as over the plan terms. It can't amend them, add them, delete them, or interpret them. It has no authority to define who will be eligible participants in the plan, what the contribution requirements will be, either from the company or from the employees. Did the ASAs in Mondry and MS contain those provisions? I'm sorry, ma'am? Did the ASAs in Mondry and MS contain those provisions? I do not recall that the opinion says that they, the two opinions say that they do. The difference in those other cases, Your Honor, and I believe in each case, that the third party provider in those cases was given authority over claims, discretionary authority either to decide a claim, for example, like in a health care plan, like you hire Blue Cross Blue Shield to administer the claims. Blue Cross Blue Shield sits in judgment on what claims are medically necessary and whether they'll be reimbursed. That type of discretionary authority, the claims administration qualified as a contract under which the plan is operated. Likewise, in the Primera case, which is the principal case cited by Mr. Kelly here, in that case, the administrator was given authority to adjudicate claims for denial of benefits. If there was a claim under Section 503 of ERISA for denial of benefits, Microsoft delegated the authority to that outside company to decide it. So your argument is that the language of the statute essentially means that the document must involve an entity's discretionary authority before it's covered with, by the statute, even if it's functionally and operationally a part of the operation of the plan. Well, that's right, Your Honor, and maybe an analogy might help. If a corporation opens up an account, bank accounts, Bank of America . . . Yes, sir. . . . understand the context of it, because the statutory language doesn't say that. It says, I think we talked about managing and operating, you know, managing and operating. You can operate something in a non-discretionary way. So it sounds like your argument hinges on the way that's been interpreted in Faircloth. In part in that, Your Honor, but also I think that the maxim of, I forget the Latin term, but it's, you know, you're known by the company you keep. If you look at the other documents, that section 104 concerns, it's the plan document. It's the trust that sets up the plan. It's the organic constituent documents that create the plan and decide who will control it. And so when it talks about the contracts under which a plan is established or operated, I think it's informed by the company of the other types of contracts Congress put, or documents Congress put into that statute. Look, if Congress had wanted to say 104 requires production of every contract that a plan enters into or every contract for a service provider to the plan, it could have easily written the statute to say that. It didn't. It used that very particular phraseology about established or under which operated. And so that has to mean the types of discretionary authorities that these other types of instruments provide. Do you have, let's assume hypothetically you're wrong there and we think it's covered by the statute. Is there, Judge Berner asked earlier about a materiality issue. Is there any second order question beyond whether it is or is not covered by the statute? Well, I heard my colleague say that he believes it has to be material to his claim. It clearly is not material to his claim for the denial of the benefits. You look at all the briefing in the district court and here, he doesn't rely on that administrative services agreement at all to say that there was an abuse of discretion. My question though is as a matter of law, regardless of what's argued here, is there authority that there's a second order question about materiality or anything else? I think there are second order questions about materiality. What's the, where's that come from? I think in the discretion, if it bears in terms of like what relief the district court will provide. I think the issue was on the penalty question. It bears on that. If there's a violation, then it bears on whether there's a penalty. It doesn't bear on whether it's a violation. Is that? I think that's right, Your Honor. But if I may make one last comment, I realize my time is out. But if you want to see who does manage or operate the plan, that is described in Article 10 of the plan document. It appears on joint appendix page 364 in the first volume. It lists there the plan administrator, the investment committee, the monitoring committee, the management committee, and the Altria stock and non-stock independent fiduciaries. Who is missing from that list of administrators?  That is a reflection that fidelity does not operate, manage, or direct the affairs of the plan. Thank you, Your Honors. Mr. Field. Good morning, Your Honors. May it please the court. Eric Field on behalf of Fidelity. I'll primarily just stick to the fiduciary breach questions, because that's the only claim that's directed at Fidelity. And as the court has already recognized, that fidelity can only be a fiduciary if it has discretion. And in this case, under the contract, under the plan, and under prior decisions of this court, not the courts, a record keeper that just performs ministerial functions cannot be a fiduciary because it has no discretion. Your friend on the other side says that this is a question of fact, and that on summary judgment, it was appropriate to take all inferences in favor of the non-moving party, and therefore, summary judgment was inappropriate. Why isn't that right? Because there's no contested material fact here, Your Honor. It's all in the transcript. If you read the transcript, and if you read the documents that are all part of the record already, the document, the ASA, most importantly, says that not only is Fidelity not a fiduciary, it cannot take any action under the contract that would make it a fiduciary. But even if the contract says no fiduciary, they're not allowed to be a fiduciary. There's no obligation that your client be a fiduciary. Isn't it possible that in conversation on the phone, the Fidelity representative could give advice in violation of the ASA, but give advice, and that the individual calling could reasonably believe that they were being given advice and follow that advice? And so, is it possible, as a matter of law, that Fidelity could act as a fiduciary, even if the contractual agreement didn't provide the authority to act as a fiduciary? If you read the transcript, that isn't what occurred. Is it possible, if Fidelity had taken the steps to say, we are giving you advice, and we're directing you how to do this, it's possible? Do they have to actually use the words, we're giving you advice? What if they just give advice? But under the transcript, that isn't what occurred. We're just trying, but as a matter of law, the fact that you put it in writing that you're not, doesn't give you a get out of jail free card if you, in fact, proceed to act as a fiduciary. Do you agree with that as a matter of law? If you go beyond what the contract provides and take this next step to act as a function of fiduciary towards limited actions, yes, you could talk yourself into being a fiduciary. But that is not what has happened here. When you read the transcript, it was Mr. Kelly who called and said, I want to have my account distributed. The caller, the first November, second call, first said to him, okay, the process will be because you want to do an in-kind distribution, and you want to do a cash distribution of the index fund and the Altria shares, we will liquidate those shares to cash, and we will mail you a check. At the same time, we will mail you your stock certificate. So you're going to get everything in the mail, and that will take one to two weeks. It was Mr. Kelly and his advisors who then said, well, we don't want to use the mail. Is there another option? So they weren't giving him advice. They weren't volunteering, here are all these options you have. It was Mr. Kelly who said, is there another way we can do this? I think I understand your argument there. I just want to, again, have a kind of structural point. Do you agree that unlike the review of the disability denial, that this is a straight Rule 56, is there a genuine issue of material fact construing the evidence in the light most favorable to Mr. Kelly? I do agree, Your Honor. I know you think you win, nonetheless, but that's our standard. That is your standard. Is there a genuine issue of material fact? And here, because we have the contracts, we have the plan document, and we have the transcript, there is no other facts that are going to come out that is going to change the equation. We would just be back, and there is no jury trial because it's an arrest case. We'd be back before the same court on the same identical record that he's already found, didn't support a finding that fidelity was fiduciary. So we've already really been through this process. Even though they're cross motions of summary judgment, that's an interesting procedural issue. It's cross motions for summary judgment, but this is a non-jury trial. Even though we're under Rule 56, practically, the court's had all the information. I'm going to ask your colleague about that. In an arresting case, it's typically going to be decided on summary judgment because it's an administrative record case. There is no live testimony. There is no jury. So everything that's going to be needed to decide the case is already before the court on this summary judgment. So there's really no point to go back even because any material fact has already been reviewed by the court, and he's already decided that there is nothing left for me to do because the transcript, as I said, makes clear what happened here. Fidelity was asked, what are my options? Here are your options. They did not tell him which one was better. In fact, the first option they said was, we'll mail it to you. Even after that, when Mr. Kelly asked, well, could I split the transactions and do the cash distribution separate from the in-kind, and they said you could, but then you would still have to take the cash distribution in a check through the mail, which Mr. Kelly said, well, I don't want to take it through the mail. That's when they said, okay, well, then your option is to use the Fidelity retail accounts. That's how it's going to work. Thank you. Mr. Hawkins. Thank you, Your Honor. When I was in law school, I got up and rebuttal once and said, I have 13 arguments to rebut, and we're not going to do that today. That didn't go well either. To reference what Your Honor was just talking about with the breach fiduciary duty claim, I would analogize it to a de novo review, if you want to think of it that way. This Court's Techman decision would control any kind of analysis. The Court below made no findings of fact or conclusions of law, and that's what it would have had to have done if it were acting as a finder of fact for a non-jury trial case. Fair enough, but . . . They'd be entitled to much more strong weight. What do you mean much more strong weight? They would be given much more deference. If Judge Hudson had issued findings of fact and conclusions of law, the findings of fact would be reviewed for clear error. I hear you, but you don't have any other evidence. There's no more evidence to be considered than what was before the District Court. Well, yes. The items that were not before the District Court were the audio files of all of the calls. I think the transcript is informative, but it is not dispositive. I think the audio of all of the calls, which does exist, would have been important. Would the calls made after your client made his decision be relevant? Yes. Why is that? Well, for two reasons. One, the November 10th call in particular and the November 9th call, Fidelity admits, they acknowledge that the linkage issue was not conveyed. They explain it in clear terms in a way that was never done before. I think the contrast there is probative of what Mr. Kelly was not told on November 2nd and November 5th. To go to the November 5th issue, because Mr. Schabelsky, and it's a common theme, wants to say that everything gets wiped away on November 5th, but that ignores the November 2nd issue. If he'd been given all of the information, he would never have needed to get to November 5th. I guess it just strikes me that there's no obligation to give all of this information if Fidelity is not acting . . . is not a fiduciary. Your threshold issue is whether Fidelity is a fiduciary in the first place. I completely agree with you. Let me ask my question. Because the agreement itself does not seem to grant any fiduciary obligations, you're really resting on whether the call center individual was acting as a fiduciary as a matter of fact. You seem to be arguing against yourself when on the one hand you're saying they didn't provide all the information, and on the other hand you're saying they provided so much information that they stepped into the shoes of a fiduciary. Well, a fiduciary, and this court's decision makes this clear, a fiduciary could do just as much damage by not providing information . . . But only if they're a fiduciary. Absolutely. Absolutely. How do they become a fiduciary when they're simply setting out the options of what your client can or cannot do? They know what he is trying to accomplish, and they are assisting him in that regard. It's our position that that assistance crossed the line and turned them into a fiduciary. Once that happened, all of the duties that rest upon a fiduciary come to play. I see my time is up. I have one more question. In the discussion earlier, your colleague talked about how the board relied on the lack of damages . . . Correct. . . . and how that was part of the decision, and then I asked about your damages theory at trial, and the court excluded that. Even if we were to agree with you on the other, if your expert testimony has been excluded, how is there any recovery available under the first two counts? Well, the first count is Altria's evidence proves the damages. Altria's own internal PowerPoint, pages 17 and 18 . . . So you think you can . . . And they never . . . Go ahead. So you think you come in with a theory of damages, have an expert on that, the expert's been excluded, and you still can produce damages some other way? Okay. We've got two different counts. So the count one claim is the administrative review, and when we get the denial, the very first denial, it doesn't say anything about the fact that you don't have any damages, that August 1, 2022 letter. So we respond and say, you know, breach of duties, and here's the damages, and that's when we first get a word from Altria in their response, oh, well, you didn't suffer any damages anyway. We've never had a chance to rebut that or discuss that at the administrative level, and that's the failure of the full and fair review, and that's why their evidence, their own internal evidence of what Mr. Kelly would have gained if they had addressed his theory is so important. We would have gone back and forth. Now, for the breach of fiduciary duty claim, we saw equitable relief, and there's a float that Fidelity has, and we were arguing for a discouragement of the arguments there. That's more evidence that would have been presented, regardless of our damages expert, and I don't think he should have been excluded, but there was never a motion on that, but I thank you for the . . . I do want to make this . . . Hold on a second. Do you have a question? No. Thank you, counsel. If I may, the attorney's fees, we never talked about it. If your honor's reverse on any of the first two claims, it should be vacated. We also think it is a colossal abuse of discretion and should never have been awarded in the first place. Thank you. Thank you. All right, we'll come down and greet counsel, take this matter under advisement, and move on to our next case.
judges: A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin, Nicole G. Berner